<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ROBERT ZODDA<br>Administrator of the ESTATE OF DANIEL DANIELS,<br><br>           Plaintiff,<br><br>           v.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., et al.,<br><br>           Defendants. | Civil Case No. 13-7738 (FSH)<br><br>**<u>OPINION & ORDER</u>**<br><br>Date: March 4, 2015 |

<u>**HOCHBERG, District Judge:**</u>

This matter comes before the Court upon Defendants National Union Fire Insurance Company of Pittsburgh, Pa.'s ("National Union") and American International Group, Inc.'s ("AIG") motion to dismiss (Dkt. No. 71) pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6). Defendants Catamaran Health Solutions, LLC f/k/a HealthExtras, Inc. ("Catamaran") and HealthExtras, LLC ("HealthExtras") join in National Union and AIG's motion. (Dkt. Nos. 72 & 73.) The Court has reviewed the submissions of the parties and considers the motion pursuant to Federal Rule of Civil Procedure 78.

**I.     BACKGROUND[1]**

This matter arises from the allegedly wrongful denial of the claims of the Estate of Daniel Daniels, through the estate's administrator, Robert Zodda, ("Zodda" or "Plaintiff") under an accident disability insurance policy. Zodda also alleges that Daniels' policy is illegal because it

---

[1] These facts are taken from Plaintiff's first amended complaint (Dkt. No. 59), unless otherwise noted.

was not issued to a valid blanket group under New Jersey's insurance regulations, leading to the illegal marketing (including allegedly misleading and false advertising) and sale of insurance by the various defendants. Zodda asserts the following causes of action: breach of contract; equitable reformation; insurance bad faith; violations of the New Jersey Consumer Fraud Act ("NJ CFA"); violation of the duty of good faith and fair dealing; and civil conspiracy.

In 1997, Catamaran[2] allegedly conceived, designed, and created a "Disability Benefit Scheme" (referred to herein as "the alleged scheme"). (Am. Compl. ¶ 17.) This alleged scheme included $1 million accidental permanent and total disability insurance coverage and a $2,500 out of area emergency accident and sickness medical expense benefit. HealthExtras, LLC collected and allocated premiums for the alleged scheme.

According to Plaintiff, the alleged scheme sought to avoid state insurance regulations and sold "virtually worthless" group disability insurance to individuals rather than a qualified group. Plaintiff also alleges that under New Jersey insurance regulations, only certain groups may obtain group accidental disability insurance. Under this structure, Plaintiff alleges that the master insurance policy is issued to the "group" with certificates of insurance issued by the group to the individual members. Plaintiff claims that it is the "group" that is meant to review the terms, coverage, and price to ensure its members are receiving a fair deal. Plaintiff alleges that Catamaran gained an unfair advantage in the disability insurance market by creating a "fictitious" group and directly marketing illusory disability policies to individual consumers.

According to the amended complaint, HealthExtras, Inc. established a marketing relationship with several of the nation's credit card issuing banks to get access to their customers' information and market a long term disability insurance product to people in New Jersey and

---

[2] Plaintiff refers to Catamaran as "Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc." The Court uses "Catamaran" for clarity.

throughout the country. Marketing flyers sent to these customers offered a $1 million disability insurance product called "HealthExtras" for "as little as" $9.25 per month or $14.50 per month depending on whether the individual added his or her spouse. (Am. Compl. ¶ 21.) These marketing materials featured Christopher Reeve, an actor who played Superman, endorsing the alleged scheme. A cardholder could enroll by completing a form. Catamaran would then designate that person a "member" of the group and associate them with a trust created by Catamaran and "other Defendants." (*Id.*) Catamaran would then charge the cardholder's credit card on a monthly or yearly basis for the insurance premium. These premiums would then be placed in the trust[3] for distribution to the underwriters, brokers, and Catamaran.

The accidental permanent disability policy was initially underwritten by Federal Insurance Company, a member of the Chubb Group of Insurance Companies and a successor underwriter to Reliance National Insurance. On January 1, 2005, the underwriter changed to National Union. Plaintiff alleges that the underwriters, including National Union, either misrepresented to the state insurance regulators that the policy at issue was intended to be issued to a valid group under state law or failed to apply for approval from the state regulators. The emergency accident and sickness medical expense benefit was allegedly unwritten by Virginia Surety.

Sometime between 1999 and 2001, Daniels received marketing materials from Catamaran, which were forwarded by his bank. Zodda alleges that the marketing material Daniels received indicated, *inter alia*, that the program would provide a $1 million benefit to Daniels if he was permanently disabled due to an accident. After expressing interest in the program, Catamaran allegedly sent additional information from its "Director of Client Services" stating that as a member Daniels would have two tax-free options: a $1 million lump-sum cash payment or a

---

[3] Plaintiff refers to this trust as "Trust for the Account of HealthExtras." (*See*, *e.g.*, Am. Compl. ¶ 24.)

$250,000 cash payment plus $5,000 per month for 20 years. The alleged coverage also included $2,500 per year in reimbursements for coinsurance and deductibles for healthcare expenses when traveling.

Plaintiff alleges that Catamaran paid to use the name "The Sklover Group, Inc.," a licensed broker and corporate predecessor to JLT Services Corporation, now known as Alliant Services Houston Inc., on its correspondence. Since 2005, the name Alliant Services Houston Inc. has been used by the alleged scheme on correspondence and other documents "to create the illusion that Catamaran, f/k/a, Catalyst, f/k/a HealthExtras Inc. as well as HealthExtras LLC, is a valid insurance broker." (Am. Compl. ¶ 34.)

According to the complaint, Daniels purchased the insurance at issue and paid premiums through 2009 via his bank credit card. Plaintiff alleges that during this time, Daniels' premiums were increased at least twice without the approval of the New Jersey Insurance Commissioner—an alleged violation of state law.

On February 28, 2009, Daniels fell and suffered a massive cerebral hemorrhage, resulting in permanent brain damage. Due to this brain damage, Daniels suffered a permanent loss of speech, inability to communicate, inability to use his arms and legs, loss of cognitive function, and inability to swallow. From February 28, 2009 until he passed away on June 5, 2011, Daniels remained under constant institutional medical care. In January 2013, the Daniels' estate made a claim for disability benefits under Daniels' "HealthExtras Accidental Permanent Disability Policy (policy # 9540-519)." (Am. Compl. ¶ 15.) On October 24, 2013, National Union denied the claim alleging that Daniels did not meet the definition of disability under the policy.

Plaintiff also alleges that Catamaran, National Union, and AIG circumvented New Jersey laws and regulations governing the issuance of blanket group accident and sickness insurance in

4

order to carry out the alleged scheme.[4] Specifically, Plaintiff alleges that the group at issue does not fall into one of the seven eligible blanket groups authorized by the relevant New Jersey insurance statute, N.J.S.A. § 17b:27-32(a)(1)-(7). N.J.S.A. § 17B:27-32 defines eligible blanket groups as follows:

> a. Any policy or contract of insurance against death or injury resulting from accident or from accidental means which conforms with the description and complies with the requirements contained in one of the following paragraphs shall be deemed a blanket insurance policy.
>
> (1) A policy or contract issued to any railroad, steamship, motor bus or airplane carrier of passengers, which carrier shall be deemed the policyholder, covering a group defined as all persons who may become such passengers and whereby such passengers shall be insured against loss or damage resulting from death or bodily injury either while, or as a result of, being such passengers.
>
> A policy or contract covering accidental death or injury to individuals resulting from airline accidents may also be issued under which premiums are paid from funds of the airline and the benefits are payable to the airline or to a trust established for the purpose of funding payments to persons with claims against the airline by reason of the death or bodily injury of individuals.
>
> (2) A policy or contract issued in the name of any volunteer fire department, first aid or ambulance squad or volunteer police organization which shall be deemed the policyholder and covering all of the members of any such organization against loss from accidents resulting from hazards incidental to duties in connection with such organizations.
>
> (3) A policy or contract issued in the name of any established organization, whether incorporated or not, having community recognition and operating for the welfare of the community and not for profit which shall be deemed the policyholder and covering all volunteer workers who are members of the organization and who serve without pecuniary compensation against loss from accidents

---

[4] Plaintiff alleges that blanket group insurance differs from typical individual insurance in that each member of the group is provided coverage under a so-called "master policy" (which is issued to the group or association) and receives a certificate of insurance summarizing the coverage terms and the individual rights under the master policy.

occurring while engaged in the actual performance of duties on behalf of such organization.

(4) A policy or contract issued to any employer, who shall be deemed the policyholder, covering any group of employees defined by reference to exceptional hazards incident to such employment, insuring such employees against death or bodily injury resulting while or from being exposed to such exceptional hazards.

(5) A policy or contract issued to a college, school, or other institution of learning or to the head or principal thereof, who or which shall be deemed the policyholder.

(6) A policy or contract issued to and in the name of an incorporated or unincorporated association of persons having a common interest or calling, which association shall be deemed the policyholder, having not less than 50 members, covering all the members of such association, or if part or all of the premium is to be derived from funds contributed by the insured members and if the opportunity to take such insurance is offered to all eligible members, then such policy must cover not less than 75% of any class or classes of members determined by conditions pertaining to membership in the association.

(7) A policy or contract issued to insure any other substantially similar group approved by the commissioner as eligible for insurance under a blanket insurance policy or contract.

b. Nothing contained in this section shall be deemed to affect the legal liability of policyholders for the death of or injury to any such member of such group.

N.J.S.A. § 17B:27-32.

Plaintiff alleges that Catamaran, National Union, and AIG created a trust entitled "AIG Group Insurance Trust, for the Account of HealthExtras." "Upon information and belief, [Plaintiff alleges that the Trust] is a fictitious, illegal and sham Trust that is alter-ego of the Defendants, with premiums collected for the benefit of the Defendants rather than a valid group of persons." (Am. Compl. ¶ 50.) Plaintiff also alleges that the specific details of the ownership and control of this trust is in the exclusive control of Defendants.

Plaintiff received a description of coverage that indicated that it was a "brief description of coverage available under policy series C11695DBG" and that "[i]f any conflict should arise between the contents of this Description of Coverage and the Master Policy SRG 9540519 or if any point is not covered herein, the terms and conditions of the Master Policy will govern in all cases." (Am. Compl. ¶ 54.) Plaintiff alleges that he has never been provided with a copy of Master Policy SRG 9540519.[5] Plaintiff also alleges that these policies have not been approved by the New Jersey Department of Insurance.

Plaintiff alleges that the HealthExtras Plan Description (policy series C11695DBG) contains extremely restrictive, conflicting and confusing terms and exclusions which renders any disability insurance coverage "virtually worthless" to consumers and directly contradicts representations made in the marketing material delivered to Daniels and other New Jersey residents.

Plaintiff states that people like Daniels were "members" of the policy group, paid "membership fees," but could not communicate with each other about any unfair business or claims practices. According to the complaint, this structure was designed to keep the "members" in the dark and conceal the nature of the master policy, which National Union allegedly uses to wrongfully deny claims. In short, Plaintiff alleges that Defendants used an illegal insurance blanket group to avoid insurance regulation and disguise the fact that the policy has virtually no value to the persons who were—and are—paying premiums for it.

## II. STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.

---

[5] Defendants attached a copy of the Master Policy to their reply brief.

Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) ("[S]tating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." (citations omitted)).

When considering a motion to dismiss under *Iqbal*, the Court must conduct a two-part analysis. "First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009) (citations omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, 129 S. Ct. at 1949 (citations omitted).

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. However, an exception to the general rule is that a 'document *integral to or explicitly* relied upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'" *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citations omitted).

### III. DISCUSSION

Defendants move to dismiss each of Plaintiff's six causes of action on a variety of arguments. Each cause of action is discussed in turn below.

### a. Breach of Contract

Defendants make two arguments in support of their motion to dismiss Plaintiff's contract claim. First, Defendants argue that their letter denying coverage under the policy demonstrates that there has been no breach of contract because Daniels was not disabled as contemplated by the policy. Second, Defendants argue that the complaint should be dismissed under Rule 8(a)(2) because his allegations are conclusory and fail to identify the provision of the policy that was allegedly breached.

Defendants' first argument must be rejected on a motion to dismiss. Plaintiff pled that due to brain damage, Daniels suffered a permanent loss of speech, inability to communicate, inability to use his arms and legs, loss of cognitive function, and inability to swallow. (Am. Compl. ¶ 13.) At this stage, Plaintiff's allegation must be taken as true regardless of what Defendants argued in their letter denying Daniels' coverage under the policy.

Federal Rule of Civil Procedure 8(a)(2) requires that for a pleading to state a claim for relief it must contain "a short plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A party alleging a breach of contract satisfies its pleading requirement if it alleges "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007).

Here, Plaintiff's breach of contract claims clears the Rule 8(a)(2) hurdle. Plaintiff alleges that: (1) Daniels had a contract with National Union, AIG, Catamaran, and HealthExtras, LLC for disability insurance, (Am. Compl. ¶¶ 101–104); (2) these Defendants breached the contract by failing to pay Daniels once he became permanently disabled as required by the contract, (*see, e.g.*, Am. Compl. ¶¶ 12, 13, 16, 29, 108); (3) Daniels suffered damages by not receiving the disputed disability payment after paying premiums for a number of years, (Am. Compl. ¶¶ 16, 37, 70, 108);

9

and (4) that Daniels complied with his portion of the agreement by paying premiums and submitting a claim, (Am. Compl. ¶¶ 37, 42, 107). This case stands in contrast to the cases Defendants rely on, where the complaints contained no details concerning the alleged contracts and merely state that the relevant defendants breached a contract. Here, Plaintiff has provided various details about the underlying contract and how Defendants allegedly breached that contract. The amended complaint contains enough factual matter to allow the Defendants to discern the basis for Plaintiff's breach of contract claim. No doubt Defendants will further test this claim at the summary judgment stage of this matter.

Plaintiff's claim against Catamaran, however, must be dismissed. According to Plaintiff's amended complaint, Plaintiff filed his claim for benefits after Catamaran ended its involvement with the HealthExtras program. (Am. Compl. ¶¶ 9, 15.) Moreover, Plaintiff affirmatively pleads that he tendered his claim for benefits to National Union, not Catamaran. (*Id*. ¶ 16.) Because Plaintiff never sought performance from Catamaran and affirmatively pleads that Catamaran had already sold the HealthExtras program by the time of Daniels' claim, the breach of contract claim against Catamaran is dismissed.

  b. **Equitable Reformation**

Defendants argue that Plaintiff's equitable reformation claim sounds in fraud and should be dismissed under Rule 9(b) due to a lack of specificity. In response, Plaintiff makes two arguments. First, Plaintiff argues that the definition of "Permanent Disability" in the master policy might conflict with a New Jersey statute's definition of "Total Disability." (Dkt. No. 77, at 10–11.) Second, Plaintiff argues that he has adequately pled fraud because the advertisements for HealthExtras promised coverage, and Daniels was denied coverage.

"The traditional grounds justifying reformation of an instrument are either mutual mistake or unilateral mistake by one party and fraud or unconscionable conduct by the other." *St. Pius X*

*House of Retreats, Salvatorian Fathers v. Diocese of Camden*, 443 A.2d 1052, 1055 (N.J. 1982). Plaintiff's equitable reformation claims sound in fraud and are, therefore, governed by Rule 9(b). (*See*, *e.g.*, Am. Compl. ¶ 118 ("[F]raud and/or unconscionable conduct on the part of the Defendants . . . entitles the Plaintiff to reformation under New Jersey law.").)

Plaintiff concedes that he does not know if there is a mistake because he allegedly does not have access to the Master Policy. (Dkt. No. 77, at 10 ("At this point, due to the fact that Defendants issued the policy to themselves as the 'policyholder' and have refused to provide the Plaintiff (and now the Court) with a copy, there is no way to determine whether a mistake was made.").) As the letter denying Plaintiff's benefits claim plainly stated, however, Defendants relied on the "Description of Coverage" within Plaintiff's possession to deny his claim. (*See* Dkt. No. 71-4); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("[A] 'document *integral to or explicitly* relied upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'") (citations omitted). A mistake, by one or both parties, is necessary to plead a claim for equitable reformation. Because Plaintiff did not sufficiently plead a mistake, this claim is dismissed.[6]

National Union and AIG are also properly dismissed on a separate, independent ground. To support his equitable reformation claim, Plaintiff references the marketing and sale of the HealthExtras program. (Dkt. No. 77, at 11–12 (citing Am. Compl. ¶¶ 32, 36, 66).) However, these allegations only address marketing by Catamaran. Indeed, National Union did not even join the alleged scheme until 2005, years after Daniels received these advertising materials and signed up for the insurance at issue. (Am. Compl. ¶¶ 21, 39.) Therefore, Plaintiff's equitable reformation

---

[6] While Plaintiff does plead that "the insurance contract does not properly express the agreement of the parties or the reasonable expectation of the insured," (Am. Compl. ¶ 118), he fails to explain what his expectation was, how the agreement differs from that expectation, or any underlying mistake by Daniels.

11

claim against National Union and its parent company, AIG, would also be dismissed on this separate, independent ground.

In support of his allegations of fraud, Plaintiff argues that the definition of "Permanent Disability" found within the master policy might conflict with a New Jersey insurance statute addressing "Total Disability." (Dkt. No. 77, at 10–11.) The statute Plaintiff relies on states:

> As used in this act: . . . f. "Total disability of the employee or member" exists only while the employee or member (1) is not engaged in any gainful occupation, and (2) is completely unable, due to sickness or injury or both, to engage in any and every gainful occupation for which the person is reasonably fitted by education, training or experience.

N.J.S.A. § 17B:27-51.11(f). The Court finds that this definition is only relevant to the use of the phrase "Total disability of the employee or member" as used in that particular act. There is no indication that the New Jersey legislature intended for this definition to displace the definitions found in insurance contracts. Indeed, both the legislative history of the act and the act itself indicate that Plaintiff's proposed definition does not displace any definition set forth in his policy. N.J.S.A. § 17:B:27-51.12 explains that the statute does not apply to group policies covering "accidental injuries only." *See* N.J.S.A. 17B:27-51.12. The purpose of the statute is to ensure that medical insurance coverage through an employer or membership does not end—subject to certain conditions—because an employee or member is terminated as the result of "total disability." *Id*. The historical and statutory notes for N.J.S.A. § 17B:27-51.11 also indicate that it "provid[es] for the continuation of group health insurance benefits for certain disabled persons, and supplementing Title 17B of the New Jersey Statutes." Simply put, this statutory definition cannot form the basis for the underlying fraud in Plaintiff's equitable reformation claim.

    c.    **Insurance Bad Faith**

Defendants argue that Plaintiff's insurance bad faith claim should be dismissed for two reasons. First, Defendants argue that Plaintiff's allegations fail to contain enough factual support to meet *Iqbal*'s pleading requirements. Second, Defendants argue that based on the medical record attached to their letter denying coverage for Mr. Daniels shows that coverage was at least "fairly debatable" in this case, defeating Plaintiff's bad faith claim as a matter of law.

Under New Jersey law, "an insurance company may be liable to a policyholder for bad faith in the context of paying benefits under a policy. The scope of that duty is not to be equated with simple negligence. In the case of denial of benefits, bad faith is established by showing that no debatable reasons existed for denial of the benefits."[7] *Pickett v. Lloyd's*, 621 A.2d 445, 457 (1993). "Under the 'fairly debatable' standard, a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an insurer's bad-faith refusal to pay the claim." *Id*. at 473.

The Court finds that resolution of this claim against National Union is premature at this point. Defendants rely on medical records that (i) come from outside of Plaintiff's complaint and (ii) that are directly disputed by Plaintiff's complaint. To wit: Plaintiff alleges that due to brain damage, Daniels suffered a permanent loss of speech, inability to communicate, inability to use his arms and legs, loss of cognitive function, and inability to swallow. (Am. Compl. ¶ 13.) At this time, the Court will not consider these medical records as they are not integral to or explicitly relied upon in the amended complaint. Moreover, their contents appear disputed by Plaintiff. Defendants' argument that this very debate proves Plaintiff cannot show that "no debatable reasons

---

[7] In other words, "[t]o show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Pickett*, 621 A.2d at 457.

existed for the denial," *Pickett*, 621 A.2d at 457, fails to persuade the Court at this time. A factual issue that appears debatable at the motion to dismiss stage may prove immaterial following discovery. *See N.J. Title Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, Civ. No. 11-630, 2011 WL 6887130, at *7 (D.N.J. Dec. 27, 2011) ("The 'fairly debatable' standard will be met if the claimant could have established as a matter of law a right to summary judgment on the substantive claim. Therefore, as a matter of law, a claim of bad faith must fail if there is an issue of material fact as to the underlying claim regarding Plaintiff's entitlement to insurance benefits.") Of course, this claim may be more amenable to resolution on summary judgment.

Plaintiff's bad faith insurance claim against Catamaran, however, plainly fails. In order to assert a bad faith denial of insurance benefits, at a minimum Plaintiff must show that Catamaran denied his request for benefits. Here, Plaintiff admits in his amended complaint that he did not request benefits under the policy until after Catamaran allegedly sold HealthExtras, LLC to a different entity. (Am. Compl. ¶ 9 (Catamaran sold HealthExtras, LLC in August 2012); *id.* ¶ 15 (claim made in January 2013).) Under these circumstances, Catamaran cannot be liable for a bad faith insurance claim when it had no connection to the policy at the point when the claim was denied. Plaintiff's bad faith insurance claim against Catamaran is dismissed.

    d.    **New Jersey Consumer Fraud Act ("CFA")**

Defendants move to dismiss Plaintiff's CFA cause of action for two reasons. First, Defendants argue that Plaintiff's allegations do not meet the pleading requirements of Rule 9(b). Second, Defendants argue that the CFA does not apply to this case because New Jersey law allegedly grants exclusive regulatory jurisdiction of insurance companies to the New Jersey Department of Insurance.

Under New Jersey law, "[a] consumer may proceed with a private cause of action against a merchant under the CFA if she can show that the merchant engaged in an 'unlawful practice,' as

defined in N.J.S.A. 56:8-2, and that she 'suffer[ed] [an] ascertainable loss . . . as a result of the use or employment' of the unlawful practice." *Lee v. Carter-Reed Co.*, 4 A.3d 561, 576 (2010) (citing N.J.S.A. § 56:8-19). If a consumer proves (1) an unlawful practice, (2) an ascertainable loss, and (3) a causal relationship between the unlawful conduct and the ascertainable loss, she is entitled to legal and/or equitable relief, treble damages, and reasonable attorneys' fees. *Id.*

Under the CFA, an unlawful practice is "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate." N.J.S.A. § 56:8-2. "An ascertainable loss is a loss that is quantifiable or measurable; it is not hypothetical or illusory." *Lee*, 4 A.3d at 576 (citations omitted).

CFA claims are subject to Federal Rule of Civil Procedure 9(b), which requires parties alleging fraud to state the circumstances constituting the fraud "with particularity." Fed. R. Civ. P. 9(b); *see also Frederico v. Home Depot*, 507 F.3d 188, 200–202 (3d Cir. 2007); *F.D.I.C. v. Bathgate*, 27 F.3d 850, 876 (3d Cir. 1994). To meet this standard, "a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which [it is] charged. . . . [T]he plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico*, 507 F.3d at 200 (citations omitted). When multiple defendants are involved the complaint must plead with particularity by specifying the allegations of fraud applying to each defendant. *MDNet, Inc. v. Pharmacia Corp.*, 147 F. App'x 239, 245 (3d Cir. 2005); *see also John Wiley & Sons, Inc. v. Rivadeneyra*, Civ. No. 13-1085, 2013 WL 6816369, at *6 (D.N.J. Dec. 20, 2013) ("A fraud claim will be dismissed where a [p]laintiff

15

lumps all defendants together as having engaged in wrongful conduct without specifying which defendant was responsible for which actions.") (citations omitted).

Defendants' first argument fails: Plaintiff has injected enough specificity to survive a motion to dismiss. The amended complaint sufficiently communicates the details of the alleged scheme, its time period, and each Defendant's alleged role. (*See, e.g.*, Am. Compl. ¶¶ 66–70 (alleging fraudulent marketing scheme); *id.* ¶ 17 (outlining origins of alleged scheme in 1997); *id.* ¶¶ 71–95 (outlining each Defendant's alleged role).)

Defendants' second argument turns on the line between the CFA and insurance industry regulation. Even when a party alleges that an insurance company has violated regulations under the New Jersey Unfair Claims Act, "the alleged violations do not constitute fraudulent or misleading commercial practices. . . . New Jersey courts that have decided the issue have consistently held that the payment of insurance benefits is not subject to the Consumer Fraud Act." *Van Holt v. Liberty Mut. Fire Ins. Co.*, 163 F.3d 161, 168 (3d Cir. 1998). In short, under New Jersey law, violations of regulations related to the payment of claims is the subject to the exclusive regulatory jurisdiction of the New Jersey Department of Insurance. *See Pierzga v. Ohio Cas. Grp. of Ins. Cos.*, 504 A.2d 1200, 1204 (N.J. Super. Ct. App. Div. 1986). The purpose of this exclusive jurisdiction is to reduce the risk of contradictory regulations and factual determinations. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 975 F. Supp. 584, 618 (D.N.J. 1996).

The CFA's language, however, is broad enough to cover "the sale of insurance policies as goods and services that are marketed to consumers." *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 696 A.2d 546, 551 (1997) (citations omitted). In this case, Plaintiff alleges deceptive marketing in relation to the sale of the HealthExtras insurance coverage. (Am. Compl. ¶¶ 66–70.) Should Plaintiff prove that his CFA claim arises from allegedly deceptive advertising, his claims would not be subject to the exclusive jurisdiction of the New Jersey Department of Insurance.

Plaintiff's marketing-based CFA claim would not reach Nation Union and AIG, however. The amended complaint alleges that Catamaran is the party responsible for advertising HealthExtras. (Am. Compl. ¶¶ 20, 21, 27, 31, 58, 93.) National Union allegedly joined the scheme in 2005—years after Daniels received advertising materials and signed up for the insurance. (Am. Compl. ¶¶ 21, 39.) Therefore, Plaintiff's CFA claim is dismissed with respect to National Union and its parent, AIG.[8]

### e. Breach of the Covenant of Good Faith and Fair Dealing

Defendants move to dismiss Plaintiff's breach of the covenant of good faith and fair dealing claim for two reasons. First, Defendants argue that Plaintiff's claim rests on events surrounding the formation of a contract, an area that the covenant of good faith and fair dealing does not address. Second, Defendants argue that the amended complaint does not identify any particular term that Defendants breached or failed to perform in good faith.

"[E]very contract in New Jersey contains an implied covenant of good faith and fair dealing." *Kalogeras v. 239 Broad Ave., LLC*, 997 A.2d 943, 953 (2010). "That is, neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id*. "'Good faith' imports standards of decency, fairness or reasonableness and requires a party to refrain from destroying or injuring the right of the other party to receive its contractual benefits." *HSBC Bank USA, Nat. Ass'n v. Woodhouse*, No. A-1736-10T4, 2012 WL 1868217, at *3 (N.J. Super. Ct. App. Div. May 24, 2012). "The implied covenant

---

[8] The Court notes that if, in the alternative, the basis of Plaintiff's CFA claim is National Union's refusal to pay benefits in violation of New Jersey's insurance regulations then that claim would be dismissed in light of the Department of Insurance's exclusive jurisdiction over the payment of claims.

17

of good faith and fair dealing focuses on the performance and enforcement of a valid agreement more than it regulates contract formation."[9] *Id*. at *4.

Plaintiff's opposition fails to identify how either Defendant destroyed or injured the right of Daniels to receive the fruits of his contract. Plaintiff argues that he can state a claim for a violation of the covenant of good faith and fair dealing because (i) he does not have access to the master policy[10] and (ii) because a statutory definition of "Total Disability" might conflict with the insurance policy. Plaintiff's first argument fails because it still does not give any factual basis for how Defendants deprived him of the fruits of the contract. And, as explained above, this statutory definition of "Total Disability" does not displace the meaning of "permanent disability" as used in Daniels' insurance policy.

Because Plaintiff has failed to provide any factual basis for this claim, it is dismissed.

### f. Civil Conspiracy

Defendants argue that the Court should dismiss Plaintiff's civil conspiracy claim if the Court dismisses Plaintiff's CFA claim because the conspiracy claim is a derivative cause of action. Because the Court did not dismiss Plaintiff's CFA claim, Defendants first argument fails. Defendants secondly argue that Plaintiff's civil conspiracy claim fails to plead the elements of a civil conspiracy with the requisite specificity.

In New Jersey, a civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal

---

[9] The Court notes that the allegations found in the good faith and fair dealing portion of the amended complaint appear to address contract formation rather than performance or enforcement. This provides a separate and independent ground for dismissal of this claim.

[10] Plaintiff had access to the "Description of Coverage" document prior to filing his amended complaint. Defendants also contend that Plaintiff had access to the master policy for over a month before filing his opposition brief.

18

element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263 (2005). "[T]o succeed on a civil conspiracy claim, the plaintiff must assert an underlying tort claim." *Trico Equip., Inc. v. Manor*, Civ. No. 08-5561, 2011 WL 705703, at *8 (D.N.J. Feb. 22, 2011). If there is no valid underlying tort, a claim for civil conspiracy should be dismissed. *See Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 533 (D.N.J. 2011) ("Under New Jersey law, a claim for civil conspiracy cannot survive without a viable underlying tort, and because all of Plaintiffs' tort claims fail as a matter of law, Plaintiffs' civil conspiracy claim must be dismissed.").

      This Court finds that Plaintiff's amended complaint sufficiently pleads a civil conspiracy. The heart of Plaintiff's civil conspiracy claim is that the Defendants agreed to fraudulently market and collect premiums on a group health insurance policy in contravention to New Jersey law. Plaintiff has sufficiently alleged the underlying wrong, as noted above. Defendants attack the sufficiency of Plaintiff's pleading of an agreement between the Defendants, but "[i]t is well known that the nature of a conspiracy is such that more often than not the only type of evidence available is circumstantial in nature." *Morgan v. Union Cnty. Bd. of Chosen Freeholders*, 633 A.2d 985, 998 (N.J. Super. Ct. App. Div. 1993). In alleging that each Defendant agreed to and conducted particular business in furtherance of the alleged scheme, Plaintiff alleges that each Defendant entered into agreement in the alleged civil conspiracy. (Am. Compl. ¶¶ 71–95.) Plaintiff need not allege facts to show that "each participant in a conspiracy knew the exact limits of the illegal plan." *Id.* The alleged sequence of events, viewed in its entirety, creates a substantial enough possibility of a conspiracy to defeat the Defendants' motion to dismiss this claim.

## IV. CONCLUSION & ORDER

For the reasons stated above,

**IT IS** on this 4th day of March, 2015, hereby

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 71) is **GRANTED IN PART AND DENIED IN PART**; and it is further

**ORDERED** that Plaintiff's breach of contract and insurance bad faith claims (Counts One and Three) are **DISMISSED WITHOUT PREJUDICE** as to Defendant Catamaran; and it is further

**ORDERED** that Plaintiff's CFA claim (Count Four) is **DISMISSED WITHOUT PREJUDICE** as to Defendants National Union and AIG; and it is further

**ORDERED** that Plaintiff's equitable reformation and breach of the covenant of good faith and fair dealing claims (Counts Two and Five) are **DISMISSED WITHOUT PREJUDICE** as to all Defendants.

**IT IS SO ORDERED.**

 **/s/ Hon. Faith S. Hochberg**
Hon. Faith S. Hochberg, U.S.D.J.